STATE, ex rel. REEDER, Relator, v. MUNICIPAL CIVIL SERVICE
COMMISSION OF COLUMBUS et, Respondents.

Common Pleas Court, Franklin County.

No. 201708.   Decided October 14, 1958.

226

Robert Shaw, for relator.
Russell Leach, City Atty., for respondents.

## OPINION

By SATER, J.

This is an action in mandamus wherein the relator, hereinafter referred to as Reeder, seeks restoration to his position in the Civil Service classification of principal personnel technician. The respondents are the Municipal Civil Service Commission of Columbus, Ohio, and also the three commissioners thereof, William H. Brooks, Melville D. Frank and Rand P. Hollenback. By his petition, positively verified, Reeder says that on or about June 4, 1936, he was permanently appointed from an eligible list to the position of examiner in the department of respondent Commission (i. e., his appointment to that position was made from a list of those made eligible by having previously taken and passed a Civil Service examination); that on September 1, 1941, that position was reclassified under the classification title Principal Personnel Examiner, and again as of February 1, 1954, it was again reclassified under the classification title Principal Personnel Technician. Reeder further says that he then remained in that position and status until May 31, 1958, at which time Respondent Commission wrongfully and in violation of his rights attempted to discharge him therefrom. He says that no charges have been preferred or complaints made against him by respondent Commission; that despite his notification three days later to respondent Commission of his intention to appeal its verbal order of dismissal and of his request for a copy of the charges and proceedings against him in accordance within Sec. 149-1 of the Columbus City Charter, he has received no copy of any charge against him but that to the contrary, the respondent Commission refused to entertain a hearing on his appeal.

When he reported on June 4, 1958, for work in his classified position, he was refused the right to perform the duties of that position. He further states that he has never resigned, abandoned or waived his rights to that position nor has he ever been requested by respondent Commission or by any of the respondent members thereof, to resign, abandon or waive any of those rights. He finally states that by reason of the foregoing he has no adequate remedy at law, and therefore prays restoration.

Reeder's contention is thus grounded on the claim that since 1936, he has for 22 years held Civil Service status in the employ of respondent Commission, and is consequently entitled to the protection of preference of written charges, opportunity to be heard in answer and the right of appeal provided by Sections 149 (M) and 149-1 of the Columbus City Charter. If his contention is correct, respondent Commission has violated not only its Charter-based duties, but also its own related rules set up under Charter section 149 and which appear herein as Court Exhibit No. 7. Furthermore, it is best noted at this point that credence is lent to Reeder's contention by the written opinion of respondent Commission's legal advisor, Russell Leach, Esq., attorney for the City of Columbus, its departments, divisions and officers. On or about May 19, 1958, respondent Commission, or a majority thereof, being uncertain of Reeder's Civil Service (or classified) status, made either oral or written request of Mr. Leach for his opinion as to Reeder's status. That opinion, No. 49-58, Exhibit 4 herein, was dated and delivered to respondent Commission on May 26, 1958. If that opinion was erroneous, respondent Commission might conceivably be justified in disregarding it. On the other hand, public bodies and officers have the right, duty and privilege in time of uncertainty to seek and receive advice and opinions from their duly constituted legal advisor, and when given that advice, they are under moral or ethical, if not legal obligation, to act accordingly; nor may we assume, especially under the facts adduced herein, that respondent Commission appealed with frivolity to Mr. Leach. Consequently, if Mr. Leach's opinion was correct, the respondent Commission —or, more accurately, two of its three members—in Reeder's eyes, flagrantly disregarded just five days later Mr. Leach's opinion by discharging Reeder without notice, without charges, without hearing, without permitting appeal; the last sentence of that 5-page opinion says:

"In view of the facts supplied me, or of which I have knowledge, it is my opinion that Mr. Gale Reeder has retained his permanent status as a Principal Personnel Technician, a classified position."

To return now, after temporary relief had been given Reeder, respondents' answer was filed. After admitting the legal status of respondents, it denies each and every other allegation in Reeder's petition. The clear legal purpose of that form of answer was to put squarely in issue all of the allegations of Reeder's petition, because a majority of the respondent Commission were of the opinion, for one reason or another, that at the time of his discharge Reeder had no Civil Service status at all, and was consequently not entitled to the above-listed

benefits and protections of the City Charter. But as the case unfolded into the record with testimony and exhibits, the element of inherent necessity to the filing of such a broad answer became increasingly apparent. No two Commissioners agreed in their thinking as to Reeder's status. No wonder the request for the Leach opinion, but the greater the wonder that, received, it was not followed. The Senior Commissioner, Mr. Hollenback, was convinced that Reeder's Civil Service status antedated the Jacobs survey of 1941, and was never lost, abandoned or waived, the only changes affecting him being those arising from reclassification of his position incident to the Jacobs and Kroeger surveys later referred to herein. Mr. Commissioner Brooks knew that Reeder held the position of principal personnel technician with respondent Commission in May, 1957, but lost that preferred status by election almost a year later when Reeder, who was also holding the unclassified (non-civil service) job of secretary and personnel officer, proposed the advancement of Mr. Thrash to the status of principal personnel technician, thereby reserving the higher pay job to himself; despite this asserted election, Mr. Brooks was one of the two who later sought the Leach opinion for the stated reason that he was even then uncertain of Reeder's Civil Service status, even though his earlier asserted election was then 90 days in the past. Newly incumbent Commissioner Frank said that "in accordance with my knowledge he (Reeder) has never enjoyed Civil Service status," and, later, this colloquy: "My opinion is my own opinion, it doesn't have to agree with either of them" (Hollenback and Brooks). "Q. Does it agree with either of them? A. Evidently not, Mr. Shaw." Despite this certainty, Mr. Frank accompanied Mr. Brooks to Mr. Leach's office in search of an opinion; and, like Mr. Brooks, did not follow it when once obtained. Needless to say, this scattered approach placed a grievous burden on counsel for respondents, because he was bound of necessity to leave at least one of his clients unrepresented. But unfortunately that burden is not new. See appellee's briefs in **Gas Co. v. P. U. C. O., 138 Oh St 483.**

Trial was had on these two pleadings, petition and answer. Many witnesses testified, many exhibits were received into evidence; and the Court being still unsatisfied as to the completeness of the record, reopened the case as a result of which eight more exhibits marked "Court exhibits" were received into evidence. At the same time it was agreed that the Court might consider and utilize the telephone book-sized "Position Classification Plan" dated November, 1953, of Louis J. Kroeger and Associates. So made up, the record was closed, trial briefs filed, and the case is now on for decision on the merits.

No question of constitutionality has been raised nor any question of conflict with or divergence from State statute. Nor under the circumstances and facts of the record may it be properly asserted that mandamus is not the proper vehicle for the determination of the issues here involved. See **Moore v. Evans, 12 Abs 531; Williams, etc. v. State, ex rel. Gribbens, 15 Abs 596, aff'd. 127 Oh St 398, State, ex rel. Aurand v. Stocklein, 29 Abs 592, Toledo v. Osborn, 23 Oh Ap 62, State, ex rel. Noble,**

v. Atkinson, 31 Abs 576, State, ex rel. Desprez, v. Commissioners, 47 Oh Ap 1, State, ex rel. Wilkins, v. Merrell, 10 Abs 282, State, ex rel. Weber, v. Eirick, 40 O. L. R. 145, State, ex rel. Brittain v. Board, 95 Oh St 276, and State, ex rel. Click, v. Thormyer, 105 Oh Ap 479, Ohio Bar 9/22/58.

The proceeding, advanced for good cause out of its regular order, turns with a single exception on the interpretation and effect of Commission action, as disclosed by the record, over a substantial period of years. The only questions involved are: Did Reeder ever have Civil Service status? If he did, did he for any cause, reason or action lose it? To the determination of those questions will the interpretation and effect be directed. Following an introductory background, a chronological discussion of events should add to clarity of conclusion.

Twenty-five years ago, in March, 1933, Reeder went to work for the respondent Commission as a Grade B Clerk-stenographer. At that time he was an unclassified employee without Civil Service status or protection. Three years later in 1936 he took the required examination, passed it and was appointed examiner in the office, of that Commission. Then and there Reeder acquired Civil Service status. At those times there were and still are in effect Sections 146 to 158-1 of the City Charter covering all the duties and functions of respondent Commission. Only a small portion of those sections are here relevant. Section 147 requires respondent Commission in the main to make and enforce under 15 lettered subdivisions, rules for the classified service. Subdivision (a) requires the rules to provide "For the classification and standardization of all positions in the classified service." Section (j) provides for methods of promotion within the ranks but respondents did not seriously press the idea of promotion, and even if they had, the ensuing factual situation anyway renders that subsection and any resultant rules irrelevant and immaterial. Subdivision (m), already alluded to, covers the procedural steps of discharge such as the preferment of written charges and the right to answer. Section 149-1 covers the right of the discharged employee to appeal to the respondent Commission with transferal to it of charges and proceedings before the discharging municipal official. Rules were so made and their January 26, 1954, version appear as Court Exhibit 7; it is anomalous to note that in the case of discharge of a Commission employee the Commission is prosecutor, jury and judge, but such is the effect of our Charter and the required rules under it.

From 1936 to 1941, Reeder remained an examiner. From that time onward there was no dispute that Reeder was continuously and without interruption next to the top man in respondent Commission's office, regardless of the title to his position; top man was the secretary, an unclassified appointee.

In 1941 the City, with the aid of Jacobs and Company, completed a survey, familiarly known as the Jacobs Survey, of the positions, duties and functions of most, if not all of the City's employees. Such a survey is not uncommon nor is it in any sense a "ripper" activity. As a city grows, the duties and functions of many of its employees are changed or enlarged upon with no befitting alteration in title or in compensa-

tion. Also, for example, two or more employees in the same or different departments may be doing identical work, all under different titles and all under different rates of compensation; in its inception, this is frequently unavoidable but in the best tradition of a true Civil Service system, it is intolerable and demands correction. By means of a survey these inequalities and inequities are replaced by a pattern of uniformity and propriety of classification and position that extends both horizontally across departmental lines when necessary and perpendicularly through each department itself; demotion is prohibited, but reclassification as distinguished from promotion is utilized at times to conform title and compensation in relation to duties and functions imposed over the years by the needs of a growing city upon those already holding classified status, as was Reeder.

In April, 1941, the recommendations of the Jacobs Survey with regard to respondent Commission were presented; it is respondents' Exhibit D. There were listed the three Commissioners and Secretary Guy Harris with Gale Reeder following—next to the top man as already noted—and thereafter two others, a puny total of seven. And let it be noted that Messrs. Hughes and Garek were two of the Commissioners. The Survey recommended a titular change for Harris from secretary to secretary and chief examiner at a substantial salary increase, and a reclassification for Reeder from examiner to senior personnel examiner with a very small salary increase. We were not favored with the full Jacobs Survey, but the purposes of these recommendations are undoubtedly set forth in the preceding paragraph of this opinion and are on all fours with the Kroeger Survey which will be later discussed.

The Commission did not consider these recommendations adequate to its needs. At its meeting on June 26, 1941, it retained (Exhibit E) the senior personnel examiner classifications, but inserted between it and the office of secretary "a classification of Principal Personnel Examiner in the Department of Civil Service"; on this, "Voting was unanimous." Like the Survey itself, this action required Councilar legislation to provide salaries. This was financially effectuated two months later by Ordinance No. 538-41 (Ex. F and Court Exhibit 2). Seventeen days later, on September 11, 1941, the two immediately preceding steps were confirmed and ratified by the Commission (Exhibit G) by its following minute:

"To complete the minutes of June 26, 1941, the action of the Commission in providing for the classification of Principal Personnel Examiner in the Department of Civil Service Commission also included the reclassification of the position of Examiner (under old classification plan) and the allocation of Gale L. Reeder from the old classification of Examiner to said new classification of Principal Personnel Examiner in the Department of Civil Service Commission as a regularly permanently appointed classified employee. This action is also taken in conformance with Ordinance 538-41, effective as of September 1, 1941, the effective date of the ordinance. This by resolution: Voting, Unanimous."

Again Reeder was next to the top. Exhibit No. 4 is the conformation

of the Jacobs Survey to Commission and Council action; its "Usual Lines of Promotion" serve as a guide to the future with regard to a newly created classification, its word "Usual" in light of the foregoing means exactly what it says and no more. And let it be noted both that both Council and respondent Commission recognized these steps as a reclassification, not a promotion; and also that this particular recognition has gone unchallenged for 17 long years. No one, or all, of these steps were challenged by respondent Commission, but had they been, and were not the foregoing analysis fully adequate to meet that challenge, it would be noted that the doctrine of municipal estoppel in pais, with regard to this same Jacobs Survey and effectuating Commission action thereon, was recognized in the two opinions of this Court in the unreported case State, ex rel. Frambes, v. Barthalow, No. 171,245. To much the same effect, see also Essex v. Telegraph Co., 239 U. S., 313, 321, 60 L. ed. 301, 306, Los Angeles v. Los Angeles County, 9 Cal. 2d. 624, 72 Pac. 2d, 138, syll. 12, Eau Claire County v. Eau Claire, 172 Wisc., 240, 179 N. W., 2, 10; and State, ex rel. Witten, v. Ferguson, 148 Oh St 702, wherein the principle of estoppel is inherent.

Things went quietly until Harris resigned as secretary and chief examiner in 1944. To plug this gap, Commissioners Garek, Hughes and Hollenback met on March 10, 1944 (see Exhibit No. 7) and took the following action:

"Due to the reduction in the budget allowance for the Municipal Civil Service Commission, sufficient funds are not available at this time to appoint a regular Secretary and Chief Examiner of the Commission. In view of this fact, the Commission ordered an ordinance prepared, authorizing the payment of the maximum salary for Secretary and Chief Examiner to be paid to the Principal Personnel Examiner, who was assigned Acting Secretary and Chief Examiner by the Commission, to perform these additional duties." (Emphasis added.)

In this wise, and for clearly adequate cause, Reeder became the holder by force of necessity of two positions; and he held them for almost exactly fourteen years. Nor have we been shown, nor can we find any authority at all, suggesting the impropriety of holding two such jobs, one classified and the other unclassified, especially when but one rate of pay is made. There is no question of incompatibility between the two positions, even though one is classified and the other is not. Nor can there be question that the unclassified secretaryship replaced the prior classified position of principal personnel examiner; to do so is to nullify proper Commission action: "these additional duties." Commission and Council together do not perform futile acts.

Quietude again descended but the City continued to grow; and with it, grew the number and ramifications of municipal employees. The same overlapping, enhancement, distortion and variegation in municipal jobs evolved that had led up to and produced the Jacobs Survey. The need for another survey was indicated. This time it was conducted by Louis J. Kroeger and Associates, and the year was 1953. From it in November, 1953, came the voluminous "Position Classification

Plan"—the Kroeger Survey so-called—and was presented to Commissioners Hollenback, Hughes and Garek. The introductory fourteen pages of this Plan so specifically and clearly set forth (all along the lines of the Jacobs Survey, supra) the purposes, needs, methods and objectives of the Plan that present comment thereon will generally serve no good purpose. We note just three matters therefrom.

(1) On introductory page 10, Kroeger heartily approved of what was then section 5 of respondent Commission's rule 3:

"Where a position has been reclassified by the Commission on account of additional duties and responsibilities or to correct errors in classification, the incumbent of the former position may be re-designated to the new position, if the Commission is satisfied after investigation that he is fully qualified to fill the position."

(2) At the top of page 5 is the sentence, "We have encountered an unusual amount of concern in Columbus concerning titles." Four years later this concern became an insurmountable stumbling block to respondent Frank who would not visualize two (or more) principal personnel technicians, even though that phraseology designates a class and not a position, even though a class may hold ten or more positions of the same title; and, to use a homely illustration, two miles north of here the title "co-captain" is far from being a rarity. Any other conclusion is a bare-faced play on words.

(3) How the duties and functions of Commission employees had ramified in the twelve years since the Jacobs Survey, compare Exhibit 5 "Principal Personnel Examiner," to which Reeder was then associated, with "Principal Personnel Technician" in the Kroeger Survey's alphabetical list; and note how every ramification ties directly in to the classification without changing its basic concept. Then compare this with the alphabetical listing of personnel technician, and secretary and personnel officer; three distinct classes, yet all closely allied and interwoven to make one complete whole.

Thus, armed with nine years acting secretaryship and twelve years classification as principal personnel examiner, Reeder met and aided in the Kroeger Survey; respondents make unfavorable comment on this participation by Reeder as though some stigma attached to his assistance but they failed utterly of proof of bias or equal aid from any other source and they failed utterly to consider the burden to Kroeger had Reeder refused his assistance.

From the Survey came four exhibits. Dated October 9, 1953, Exhibit B is Kroeger's tentative position allocation list for respondent Commission. The right hand column gives present titles, the left hand column proposed titles. Omitting, as its left hand column does, all three commissioners and the secretary but including a new title, "Personnel Officer," the list obviously confines itself to only those positions and classes which Kroeger believed should be classified. Much is made of the fact that Reeder's then present principal personnel examiner title carried the recommended title, "Senior Personnel Technician" and carried the suspended notation "1 Vacancy." Suffice it to say that as

to Reeder the Commission did not accept Kroeger's recommendations in any respect. Less than a month later (Exhibit A), Commissioners Hollenback, Garek and Hughes officially met with Kroeger's representation to consider, especially, the recommendations of this Exhibit B. The minutes of this November 4, 1953, meeting show the addition of the office of Commission Secretary with no occupant and no prior title (just as though there had been no previous title or occupant) and also, with still "1 vacancy" the proposed classification of Senior Personnel Technician. Then follows this significant minute:

"The only question raised was with regard to the Commission's Secretary (permitted under the Charter) and Personnel Officer. The majority of the Commission acted to revise the recommendations to provide a Secretary and Personnel Officer in the unclassified service to eliminate the recommended Sr. Personnel Technician and in lieu thereof provide a Principal Personnel Technician. Commissioner Hollenback dissented."

Two matters arise from this meeting and minutes. (1) Some adverse comment by way of examination and cross-examination was made by respondents at the trial over the fact that the words "Commissioner Hollenback dissented" were added to the minutes more than four years after their original engrossment. Wisely, we think, little if any comment was made thereon in respondent's trial brief; a perusal of the exhibit shows beyond doubt how Commissioner Hollenback voted whether the words were added or not. (2) Does the failure of these minutes to designate Reeder of the Title, status and position of principal personnel technician deprive him thereof? Not at all. If the failure of a civil service commission to make formal entry of an appointment, does not affect the validity of the appointment, the same is a fortiori true of the less provocative act of reclassification from principal personnel examiner to principal personnel technician as is shown by Exhibit C to have been done that same night. See **Zimbelman v. Atkinson, 54 Abs 47, 50-51** and **State, ex rel. Noble, v. Atkinson, 31 Abs 576,** cited above. To clinch the point that this is a reclassification, and nothing more, let it be noted that in both the Jacobs Survey and the Kroeger Survey, the accumulations of new position duties and functions were acquired over the years and not as a result of either survey.

Comment was made that Reeder never took an examination for the position of principal personnel technician. This is agreed, but the examination was not required. On November 30, 1953, respondent Commission added to its rules (Court Exhibit 6) section 9, the relevant portion of which reads:

"In no case shall any present employee be reduced in salary, deprived of status as a permanent civil service employee, or required to take an examination to keep such status because of this classification, provided that his new permanent status may be in the appropriate classification in the new classification plan.

The following sentence relates to inapplicable situations such as promotions or changes from unclassified to classified status. Also, less than two months later, on January 26, 1954, over the signatures of Com-

missioners Hollenback, Hughes and Garek, this language became effective as a part of respondent commission's present Rules and Regulations (Court Exhibit 7) as a part of Rule III, section F, par. (a). But to make doubly certain, the same Rule III, section H provides in relevant part:

"If by reason of changed duties and responsibilities is reallocated to another class for which the minimum rate of compensation is no higher, the incumbent may, upon approval of the Commission, continue in such position with or without qualifying tests as may be determined in each case. If a position is reallocated to a class for which the maximum rate of pay is higher on account of additional duties and responsibilities or to correct errors in classification, it shall, if practicable, be filled by redesignation of the incumbent of the position of the former class to the new class, if the Commission after investigation is satisfied that the incumbent is qualified to perform the duties of the new class."

At almost the same time City Council enacted Ordinance No. 1246-53 (Court Exhibit 3) set the class and number of officers and employees of respondent Commission at nine (plus the three commissioners); among these nine are one principal personnel technician, one senior personnel technician and one secretary and personnel officer, the last, unclassified. Section 3 of this Ordinance repeats almost verbatim, the Commission's language of 1944 (Exhibit 7):

"That the Principal Personnel Technician shall receive the salary listed for Secretary and Personnel Officer while assigned by the Commission to perform these additional duties."

Note the repetition nine years later of the word "addition." Thus by Council acceptance, by Commission action and by Kroeger preferment of the spirit of Civil Service regulation, Reeder emerged as principal personnel technician and secretary and personnel officer after twenty-one years of continuous employment, mostly under classified status. Had any other result been reached by Commission action and rules as set out above, it would have been highly unconscionable and a clear disregard for the letter and spirit of the City Charter, section 149, paragraphs (a) and (o) which state that the Commission rules shall provide:

"(a) For **the classification** and standardization of all positions in the classified service." * * *

"(o) For the publication of the rules and amendments thereto in the City Bulletin. The commission shall adopt such other rules, not inconsistent with the foregoing provisions of this section, as may be necessary and proper for the enforcement of the merit system."

Thus the reclassification sheet signed by Reeder on February 1, 1954 (Exhibit 1) relating to the officers and employees showing himself in the dual capacity noted above was strictly in order. Indeed, it was nothing more than a copy of the November 1953, Kroeger Positive Allocation List, Civil Service Commission (Exhibit 6) with individual names filled in in conformity with Kroeger, Commission and Council action. This was not an appointment nor a promotion because Reeder had held classified status almost literally "whence the mind of man runneth not to the contrary" and because for many of those years he had been

actually performing all the duties and functions incident to the two newly baptised titles. It thus borders on the absurd that in 1954 respondent Commission for appointment or promotion should certify a vacancy on its staff to itself, then certify back to itself an eligible list (not shown in the record to exist) of three, then make and certify to itself an appointment or promotion, and finally four years later throw the whole ludicrous procedure out the window despite its own legal advisor's opinion that Reeder had held since 1953-54 classified service status as principal personnel technician. See also **State, ex rel. Hoornstra, v. Atkinson, 136 Oh St 569.** No, Reeder held status as indicated but performed at Commission pleasure the duties of secretary and personnel officer only because even in that august body, there are only 24 hours in any day and seven days in any week; yet in event of Commission displeasure or discovery of suitable successor as secretary and personnel officer, he simply reverted to the long familiar duties of his classified status. How prophetic!

The foregoing, incidentally, is a far more logical and probable explanation than that tendered by respondent Commission why and for what reasons Reeder proposed the promotion—and this was a true promotion—of Robert Thrash from the classification of senior personnel technician to that of principal personnel technician, upon which the respondent Commission favorably acted. See Exhibit 8. Two days later, on March 12, 1958, Reeder filled out for Thrash the proper advancement forms appearing as Exhibits I and 11. A year prior to this recommendation and action, City Council (Exhibit 9) increased to twelve—one secretary and not to exceed eleven other officers and employees—the staff of respondent Commission. This increase covered the senior personnel technician class not mentioned in the Kroeger Survey or Commission modification thereof, and also added personnel required by the growth of both City and respondent Commission. Respondents made much of Reeder's use of item No. 8 in that advancement form: that Reeder in item No. 8 (a), Name of last incumbent principal personnel technician, wrote "None," and in item No. 8 (C) Names of one or more persons in organizational unit doing identical work, he again wrote "None." Respondents draw therefrom the conclusion that Reeder thereby abandoned his classified status as principal personnel technician, i. e., that for an undisclosed unknown reason, Reeder deliberately cut his classified throat for the benefit of one barely half his age and with a quarter of his experience. To state the proposition is to answer it.

Further, respondent Commission overlooks the fact that Thrash, by item No. 4, was moving from only one provisional appointment to another. That whether Thrash was advanced or not, he was by rule if not also by charter, long overdue for an examination as to one class or another. That senior personnel technician and principal personnel technician are classifications, and not positions, with either or both available to ten or more positions subject only to the financial guidance and restriction of Council. That Council's increase in personnel of re-

spondent Commission allowed it, for all that the record shows, to create two more principal personnel technicians. That Reeder's action (see item No. 9) made no increase in the number of Commission personnel. That with at least two positions of principal personnel technicians available and Reeder occupying only one, there could not possibly be any prior incumbent of the remaining positions; even witness Stock, among others, knew of no reason why there could not be two positions in the principal personnel technician class, while witness Thrash himself was concerned not with the principal personnel technician class which status he had known for six years that Reeder claimed but with the question whether his own senior personnel technician class whose status and emoluments he enjoyed. See also respondent Hollenback:

"Now, I would like to explain the part in here about Mr. Thrash and his taking a position as Principal Personnel Technician. The reason I have said what I have, Judge, about these technical terms, is because I want to explain that I was advised and I think Mr. Reeder made the advice that Mr. Thrash was doing increasingly competent work; I have know Mr. Thrash and I agreed that he was. My thought was that he was getting a promotion. Now, I know you are going to be hounded with the word 'promotion' by the technical people, but it was my thought he was doing the work in part to which he was entitled a promotion. Now, then, that did not supplant Mr. Reeder in any way, as has been indicated from the technical interpretation. Again, I'd say I do these things as I think they are legal and from the viewpoint of a layman in all these Commissions."

That as to others doing identical work, the answer "None" was probably precisely accurate; Thrash was performing Reeder's classified duties on a day-to-day basis' just as Reeder for nine long years had been doing Guy Harris' secretarial duties on the same basis. That instead of committing classified hari kari in March, 1958, Reeder was really doing Thrash the favor of recognizing his faithful service and was greeting him as a classified equal. He made thereby no election between two positions; he was distributing the work load. How the majority of respondent Commission could overlook all these factors, especially in the face of the Leach opinion, is beyond the imagination of this Court. The one factor that respondent Commissioners could not personally know was Reeder's feeling about the Commission secretaryship. Said witness Garek,

"A. As a matter of fact, Mr. Reeder refused to waive his Civil Service standing at a time when the Commission had tendered him one or the other of the two jobs, either the Secretary job or the job he was then holding. At that time he had refused to take on the Secretary because he did not want to lose his Civil Service standing."

Respecting his wishes, the Commission held him for his skill and experience in both jobs for fourteen years. His unseating was as deliberate as was his installation, but with reverse animus.

Nor does this little interlude constitute a resignation by Reeder. To constitute a complete and operative resignation of a classified public officer, there must be an intention to relinquish a position accompanied

by a positive irrevocable act of relinquishment. See **State, ex rel. Staley, v. Lakewood, 47 Oh Ap 519, 524,** wherein mandamus was allowed. As seen above, all the essential ingredients are here lacking. Nor was it an abandonment by Reeder of his classified status. Abandonment is a word which has acquired a technical meaning symbolizing a concept which is sui generis in the law. It is an absolute unequivocal relinquishment of a right or status without regard to self or any other person. It is a virtual throwing away without regard as to who may take over or carry on. It is a total desertion of what existed or went before; and evidence thereof must be direct, affirmative or reasonably beget the exclusive inference of throwing away. Little difference attaches to the idea and principle of waiver. The record here supports no such doctrines.

Following the Kroeger Survey, peace and quiet descended upon respondent Commission for four years. But in those years two new commissioners came in to replace Garek and Hughes, and with them the whole complexion of the respondent Commission changed with regard to Reeder. One is impressed by the fact that the longer commissioners had held office in respondent Commission over the last 19 years, the more certain they were of Reeder's classified status and that he never resigned, waived or abandoned it. Hughes and Garek had been through both the Jacobs and the Kroeger survey, Hollenback through the Kroeger survey; all three were certain of Reeder's classified status. And understandably so; rusty perhaps on exact phraseology unseen and unreviewed for years, but certain beyond doubt of basic purpose and action of surveyor, Council and Commission by virtue of having been there and having participated therein, they knew. Nor were any of them shaken on cross-examination on any material point at all. Of the remainder, one agreed that "I didn't pay enough time to it, perhaps" and that he was not familiar with the Kroeger survey. In view of the volume of work confronting a commissioner and in view of the amount of authorized compensation, this is an entirely understandable concession, and the Court respects the witness for his candor. But it still does not meet the objection of State, ex rel. Noble, v. Atkinson, already cited above wherein our own Court of Appeals noted that, after a procedural blunder, anyone looking would have found the relator's true status in that case; needless to say, restoration to status was there granted by writ of mandamus. Were it necessary to do so, we could fall back on the principle of Commission ratification by express assent or by acts or conduct inconsistent with any other supposition; and respondent Commission will be held to have done so where for four years and with knowledge available of the facts, it has remained silent or has acquiesced in Reeder's reclassification, accepted the benefit of his services and authorized appropriations to pay his salary. All of these necessary elements are present here.

On the other hand, may it be said that Leach and all three of these long-time commissioners, three of them skilled attorneys, were wrong? Not so. To hold them wrong is to hold that of all the hundreds of posi-

tions twice surveyed, Reeder alone was reclassified. (Yet Exhibit 6 shows that every position under the commissioners was retitled if not also completely reclassified without subsequent question.) If such was the case, the work of both Jacobs and Kroeger was utterly useless and their compensation equally unwarranted. Such an alternative to their testimony is not only incredible; it is also unmentioned and unproven by respondent Commission. Notes in witness' hands, as unused as the bench calendar before the Court, did not relieve respondent Commission of the need to prove something, anything, beyond skeletal minute records. Reeder's classified status was and is beyond question, unwaived, unresigned, unabandoned. Observing, furthermore, the testimony and demeanor of each and every witness, and in consideration, too, of the record and all the exhibits, Reeder has long been the key man to respondent Commission.

Why and how, then, was Reeder in 1958 singled out for special attention? To obtain the answers, the Court to have a full picture before it, opened wide the gates to the admission of evidence and received much not warranted by a general denial. Respondent Commission thus received the benefit of unpleaded special defenses.

In the first place, commissioner Brooks harbored questions since 1955 or 1956 of Reeder's status. An odd assertion by him since his stated reason for dismissing Reeder was that Reeder's recommendation of Thrash, as noted above, to a position in the class of principal personnel technician in March, 1958, constituted by Reeder an election between that position and that of unclassified secretary and personnel officer. But disregarding this anomaly for the moment, he held his peace without comment either to then-commissioners Garek and Hollenback or, more particularly, to Reeder for two or three full years. That does not ring true to either Commission related history or to the spirit of the classified service of either City Charter or State constitution. Then at the end of that period of incubation, he sought Leach's opinion which in seven days time he disregarded. Unless he never resolved his doubts or unless he was newly overpersuaded, he never gave reason for requesting the Leach opinion at all. Yet at that time he was called, by his own testimony, president or chairman, an alternative appellation strikingly reminiscent of the difference between principal personnel examiner and principal personnel technician—two names for the same office.

In the second place, respondent Commissioner Frank took office early in 1958. It is no disgrace that he was a beginner, as his predecessors once had been, unfamiliar with Commission personnel, duties, functions; belike, even with Commissions' technical jargon. To his credit, he sought quickly by means of conferences with Reeder, to familiarize himself with those elements. Statedly, he relied on Reeder's briefing. Statedly, he did not look upon Reeder's status. Statedly, he, too, was sufficiently doubtful of his own judgment to join in seeking Leach's opinion. And, statedly, he, too, disregarded it completely.

Much, if not all, of this doubt grew from commissioner Frank's request of Reeder for a written report or functional and experience

digest of Commission staff. This appears as Exhibit H, and went to all three respondent commissioners and M. D. Portman; whether its later tailsheet giving Reeder's own official pedigree was equally distributed, is unknown. This document is a pure thumb-nail sketch of each and every member except Reeder, of the staff of respondent Commission's. It was a quick, brief rundown aimed to fit Mr. Frank's immediate needs, but two comments are in order. (1) Without reference back to the documents noted above in connection with the Kroeger Survey, it is almost impossible to determine the classified status of any person listed on it. (2) Reeder's own pedigree was not included in this report. With Reeder and Commissioner Frank meeting and consulting in several briefing sessions, no clear reason is shown why it should have been included; but when it was sought, it was promtly supplied and it, too, gave no positive assertion of classified status. Certainly no such paper can constitute abandonment, waiver, loss of or resignation from classified status as to Reeder any more than as to any other person named in it; it was not so intended nor could it be so taken. Said Reeder:

"Q. (By Mr. Bowen) In other words, Mr. Reeder, in your communication to Mr. Frank, you did not indicate in your experience section that you had ever held the position of Senior Personnel Technician and/or Principal Personnel Technician and/or that you held two positions concurrently, did you, sir, in this communication?

"A. No, sir, because in understanding his question, as I recall—it was verbal—my impression was he wanted to get an idea, he said, of just what the people were doing, so he could know. Now, neither did I indicate the detailed records of the other people. Some of them worked under more than one title, so I did not follow a different pattern in my case than the others. Some of these people have changed titles three, four or five times. I did not indicate that in their case."

A parallel matter arises from or is illustrated by this report. It is signed "Gale S. Reeder, Secretary and Personnel Officer"; no reference at all to principal personnel technician. This method of signature coupled with his early non-assertion of principal personnel technician's position, is taken to mean that he held no such position, or status. This interpretation we cannot, for reasons already set out herein, accept. It overlooks too many factors. First, there is the positive testimony of Garek, Hughes and Hollenback that Reeder held such status. Second, there are all the documents and actions surrounding the Kroeger survey alluded to above showing indubitably that he held such status. Third, there is the fact that in his dual status, Reeder had for 14 years been performing the unwanted functions of secretary and personnel officer (or examiner) at the express request of the Commission which placed him in that dual capacity and now seeks to strip him of both positions without hearing, without appeal. Fourth, there is the much challenged, and obvious ring of sincerity to, statement by Reeder that the holder of two positions customarily designates himself by the financially higher rated title. A simple practical inquiry will rob this situation of all its sting. Who ever heard the statement or saw the signature, "Richard

Roe, Attorney-at-law and notary public"? As above, to state the question is to answer it. Yet this is said to indicate waiver, abandonment or resignation!

Considering the contents of the record here and considering with it the known purpose of the merit system to reward long, skilled and faithful public service, it is utterly incredible to this member of the Court that despite these factors, and in the face of the Leach opinion, respondent Commission should peremptorily kick out its most experienced officer, its key man in office and in court, without even lip service to the rudiments of fair play enunciated in City Charter and Commission rules. It shocks the conscience.

We turn finally to the question whether there was lawful reason to dismiss Reeder. Shortly prior to March, 1958, a meeting was held in the mayor's office or anteroom. The respondent Commissioners were present to meet and consult with unnamed administrators and department heads The origin and purpose of this meeting were disputed. One respondent Commissioner said that complaints over administration of the merit system was the subject of discussion. Another said that the meeting was called to consider complaints against Reeder. At first it sounded as though the complaints came from such heads, but on inquiry on one Commissioner by the Court, it turned out that whatever complaints there were, were being simply transmitted by those heads; the complaints would have come from the lowest municipal employee whether classified or unclassified, whether the complaint was meritorious or not.

Whatever the cause of the meeting, only respondent Commissioner left the conference convinced that administration of respondent Commission functions was out of step with departmental activities or work, yet the record is silent why respondent Commission, of all sections of our municipal government, should conform its duties and functions to that of any other. If the hotly denied purpose of the meeting in the Mayor's office was to sack Reeder, his absence is understandable, provided Commission rules were followed: but if it was to consider Commission functions generally, Reeder's absence illogically deprived the session of the advice of him who probably had known and forgotten more about the City's merit system than the meeting had ever heard of. Anyway, soon thereafter in rapid sequence came Reeder's dismissal as secretary and personnel officer, the Leach opinion, and finally Reeder's dismissal from the position he held as principal personnel technician. In two strokes, the axe fell swiftly, completely; the rest, unscathed.

Some trivia entered into the record. It is likely that Reeder in a moment of panic, felt and said that "the rug had been pulled" from under him by respondent Commission. That is understandable; had he not had classified status, he would have had fourteen years within which to acclimate himself to the political hazards of the secretarial rug and to cushion himself against the inevitable yank. The unexplainable and unexplained comment, to the contrary, is that Reeder's claim of classified status made the majority of respondent Commissioners look "ridiculous." Ridiculous in the eyes of whom? Certainly not to the public

which could and would know nothing of the situation. Certainly not to the minority Commissioner who was already fully apprised. Certainly not to respondent Commission's staff, some of whom were not certain of their own classified status. Whom, then? No one is left but two respondent Commissioners who voted to oust. This is no test case nor has it been treated as such; but if it had been, every municipal job reclassified since the Kroeger Survey would be jeopardized by sustention of the claims of respondent Commission.

Far more sensible and lawful was the unaccepted solution tendered by respondent Commissioner Hollenback. On inquiry he said:

"THE COURT: Now, am I correct, there is apparently many times an addition of new activities to some particular position that has theretofore been created?

"THE WITNESS: That's right, and in this case, Judge, there was increased activity because we were growing and in our subsequent tape, if Mr. Frank would like to bring in another tape, we discussed what might happen if Mr. Reeder wins this case and what would happen to Mr. Thrash, and at that time, I said the common sense thing to do and in line with what we need would be to have the two men."

It would fully have executed the letter and spirit of the merit system. If the City has outgrown the Kroeger Survey, the remedy is a new survey, not the dismissal of its administrator; and this is true whether the dissatisfaction with Reeder, in a job he did not seek, rests in individual complaints over salary or classification, or in asserted failure to "cooperate." The treatment accorded Reeder goes not to the root of any meritorious complaint; is smacks too much of government of men instead of laws.

At the close of Reeder's case and again at the close of respondents' case, respondents moved to dismiss. That motion was taken under advisement. On full consideration and in view of the foregoing, it is now and hereby overruled. Furthermore, the prayer of Reeder's petition is granted, effective forthwith at respondents' costs.

At the close of respondents' case, request was made for separate findings of fact and conclusions of law. The Court later requested counsel to submit proposed findings and conclusions, but that has not been done. The following are consequently made:

### FINDINGS OF FACT

1. With respondent Commission, Gale S. Reeder has held continuous uninterrupted classified status from 1936 to date.

2. Since the time of the effectuation of the Kroeger Survey late in 1953, Reeder's classified status has been and still is that of principal personnel technician.

3. Reeder has by act or word neither resigned, waived nor abandoned either that status or that position.

4. Reeder was improperly dismissed from his classified position of principal personnel technician without hearing, without charges tendered and without granting of appeal.

## CONCLUSIONS OF LAW

1. Reeder was unlawfully dismissed from his position in the classified status of principal personnel technician.

2. Reeder was therefore under no duty or compulsion to demand reinstatement of respondent Commission to his stated class position.

3. Nothing in the Ohio Constitution, City Charter or Commission rules prevents one from holding two compatible positions, one classified and the other unclassified, so long as compensation is paid for only one of them, nor do these documents or any of them prevent the establishment of two positions in the classification of principal personnel technician.

4. Reeder has adequately and fully borne the burden of proving his claim to status and his right to immediate reinstatement.

5. Mandamus is the proper vehicle for Reeder to use to assert and to be reinstated in his legal rights.

The bond heretofore imposed on Reeder is hereby cancelled effective instanter. Submit entry covering all of the foregoing.